UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No. 23-cr-394-01 (TNM) |
| : | |
| SAMUEL BRAXTON, : | |
| also known as "FATS", : | |
| also known as "FATSO," : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SUBMISSION OF ELEMENTS OF OFFENSE AND
PROFFER OF EVIDENCE IN SUPPORT OF DEFENDANT'S PLEA OF GUILTY**

I.      Summary of the Plea Agreement

Defendant Samuel Braxton, also known as "Fats" and "Fatso," agrees to admit guilt and enter a plea of guilty to the Superseding Information, charging him with Conspiracy to Distribute and Possess with the Intent to Distribute 400 Grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl, 100 Grams or More of a Mixture and Substance Containing a Detectable Amount of any Analogue of Fentanyl, and 100 Grams or More of a Mixture and Substance Containing a Detectable Amount of Heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), 841(b)(1)(B)(i) and 846 (Count One).

II.     Elements of the Offense

The Superseding Information charges that from on or about July 2021 and continuing until on or about November 2023, the Defendant conspired with others to distribute and possess with intent to distribute 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, 100 grams or more of a mixture and substance containing a detectable amount of any analogue of fentanyl, and 100 grams or more of a mixture or substance containing a detectable amount of heroin. The essential elements of this offense, each of which the Government must

prove beyond a reasonable doubt, are:

(1) That an agreement existed between two or more persons to commit the crimes of distribution and possession with the intent to distribute a controlled substance, in particular, a mixture and substance containing a detectable amount of fentanyl, a mixture and substance containing a detectable amount of any analogue of fentanyl, and a mixture or substance containing a detectable amount of heroin;

(2) That the defendant intentionally joined in that illegal agreement; and

(3) The amount of the mixture and substance containing a detectable amount of fentanyl, which includes the reasonably foreseeable conduct of all the members of the conspiracy, was 400 grams or more;

(4) The amount of the mixture and substance containing a detectable amount of any analogue of fentanyl, which includes the reasonably foreseeable conduct of all the members of the conspiracy, was 100 grams or more; and

(5) The amount of the mixture and substance containing a detectable amount of heroin, which includes the reasonably foreseeable conduct of all the members of the conspiracy, was 100 grams or more.

The offense of violating 21 U.S.C. § 846, by conspiring to violate federal narcotics laws, does not include as an element, the commission of an overt act in furtherance of the conspiracy. *United States v. Pumphrey*, 831 F.2d 307, 308-09 (D.C. Cir. 1987).

III.   Penalties for the Offense

The penalty for conspiring to commit a narcotics offense, in violation of 21 U.S.C. § 846, is the same as that prescribed for the substantive offense, "the commission of which was the object of the . . . conspiracy." In this case, the penalties for Count One are the same as for violations of

21 U.S.C. §§ 841(b)(1)(A) and 841(b)(1)(B). The penalties under 21 U.S.C. §§ 841(b)(1)(A) are:

(A)  a term of imprisonment of not less than 10 years and not more than life;

(B)  a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $10,000,000;

(C)  a term of supervised release of not less than five years; and

(D)  a special assessment of $100.

The penalties under 21 U.S.C. §§ 841(b)(1)(B) are:

(A)  a term of imprisonment of not less than 5 years and not more than 40 years;

(B)  a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $5,000,000;

(C)  a term of supervised release of not less than four years; and

(D)  a special assessment of $100.

The United States Sentencing Guideline § 5E1.2 permits the Court to impose an additional fine to pay the costs of imprisonment and any term of supervised release and/or probation.

IV.   Brief Statement of the Facts

The following statement of facts does not purport to include all of the Defendant's illegal conduct. It also does not purport to be an inclusive recitation of everything that the Defendant heard, knew, or witnessed concerning the illegal activities of himself or others. The limited purpose of the foregoing statement of facts is to represent sufficient information for the Court to find a factual basis for accepting the Defendant's guilty plea as to Count One of the Superseding Information.

Had this case gone to trial, the Government's evidence would prove the following beyond a reasonable doubt:

3

1. The Drug Enforcement Administration commenced an investigation into a drug-trafficking organization that imports into, and distributes in, the United States fentanyl, heroin, cocaine, cocaine base, and other controlled substances.

2. Through the investigation, including wiretap interceptions of Braxton and others, law enforcement was able to identify Braxton and others as being involved in this drug trafficking operation. Braxton knowingly and intentionally agreed with more than one other person, including co-defendants Wayne Glymph, and Ronnie Rogers, to participate in a conspiracy to distribute and possess with the intent to distribute fentanyl, any analogue of fentanyl, and heroin.

3. From no later than July 2021 and continuing until about November 2023, Braxton conspired to import, distribute and possess with the intent to distribute, and did in fact broker shipments of, fentanyl, fentanyl analogue, and heroin.

4. Communications evidence, as well as physical seizures, recoveries of many kilograms of fentanyl, fentanyl analog, heroin and other illegal drugs over the course of the investigation, show that Braxton coordinated with his co-conspirators to traffic fentanyl, fentanyl analog, and heroin in the District of Columbia and elsewhere. This included over 12 kilograms of fentanyl (including carfentanil), over 1967 grams of fentanyl analogue (p-Fluorofentanyl), over 236 grams of heroin and other illegal drugs.

5. In aggregate, the converted drug weight for said mixtures and substances, including the reasonably foreseeable conduct of all the members of the conspiracy known to Braxton, was no less than 30,000 kilograms but less than 90,000 kilograms of converted drug weight. This quantity represents the total amount involved in Braxton's relevant criminal conduct, including amounts Braxton distributed or possessed with intent to distribute, and amounts distributed or

possessed with intent to distribute by co-conspirators of Braxton pursuant to jointly undertaken criminal activity that was reasonably foreseeable by Braxton and within the scope of Braxton's conspiratorial agreement.

6. Specifically, Braxton conspired to import and did orchestrate the importation, shipment and redistribution of fentanyl, fentanyl analogue, and heroin. The conspiracy involved Braxton, and co-defendants Ronnie Rogers, Wayne Glymph, Michael Stewart, Ricky Jackson, Michael Owens, OJ Brown and others. Through foreign nationals, Braxton was brokering shipments of fentanyl, fentanyl analogue and heroin into the DC area on behalf of Rogers and Glymph. Rogers and Glymph would then cut and repackage these large shipments, supplying redistributors in the DC area. Stewart, Jackson, Owens, and OJ Brown were supplied by Rogers, and they then redistributed the shipments to other redistributors and to end users. Glymph also had his redistribution network in and around the DC area for redistributing the shipments brokered by Braxton.

7. Braxton and Glymph have known each other for many years. On or about February 22, 2012, Braxton and Glymph were indicted together in District of Maryland Criminal Case No. 8:12-cr-86 for conspiring to distribute and possess with the intent to distribute heroin, cocaine base, and PCP. Both were convicted of the conspiracy and incarcerated. Braxton was eventually incarcerated at FCI Butner in North Carolina and at FCI Fort Dix in New Jersey. He was housed at FCI Fort Dix during the entirety of this investigation. He continues to serve the District of Maryland sentence. Glymph completed his District of Maryland sentence in December 2020 and then returned to the DC area.

8. Braxton and Ronnie Rogers have also known each other for many years. They were incarcerated together at FCI Butner in North Carolina for approximately four years between

2015 to 2019. Braxton served part of the sentence described above at FCI Butner and Rogers was serving a sentence of over 10 years for a separate federal heroin trafficking conviction from the District of Maryland. Rogers was released from prison in July 2019 and returned to the DC area.

9. While incarcerated at Fort Dix, Braxton had access to a contraband cell phone. Court authorized wiretaps were placed on Braxton's phone and GPS evidence placed Braxton's cell phone at Fort Dix. Evidence, including wiretap interceptions, confirmed that Braxton was the user of the phone in the conspiracy. As an example, in wiretap activation #6563, Braxton called the District of Maryland about a motion he filed in his District of Maryland case. He identified his case by its case number and provided his name as "Samuel Braxton." Braxton's cell phone was eventually seized from his housing unit at Fort Dix by law enforcement during this investigation.

10. In 2021, while Braxton was incarcerated at Fort Dix, he introduced Glymph to foreign nationals who were sources of supply for fentanyl, fentanyl analogue, heroin, and other drugs. Braxton would then orchestrate shipments of drugs into the United States for redistribution in the DC area.

11. Braxton also introduced Glymph to his former jail mate, Ronnie Rogers, for the purpose of Glymph and Rogers acquiring shipments of drugs from the foreign nationals and then cutting, repackaging and redistributing the drugs in and around the District of Columbia. Glymph and Rogers were then responsible to pay for the shipments. In 2021, 2022, and 2023, Braxton, Glymph, and Rogers communicated with foreign nationals and coordinated the shipments of kilogram quantities of fentanyl, fentanyl analogue, heroin, and other drugs to the DC area.

12. As evidenced by wiretap calls of Braxton, Glymph, and Rogers, and seizures of drugs, drug

proceeds, and drug payments, Braxton, Glymph and Rogers began to coordinate the importation and redistribution of large shipments of fentanyl (including counterfeit pills made of fentanyl), fentanyl analogue, heroin, and other drugs. As evidenced by the wiretaps, Braxton expected a cut of the drug proceeds. In activation #214, on December 7, 2022, Braxton (who was referred to as "Sam") complained to Rogers that Glymph was "fucking up my allowance … my money." In activation #347 on December 8, 2022, Braxton again complained to Rogers about his share and asked, *"when's my allowance going to get like it's supposed to be?"* Intercepted calls with Braxton on his contraband phone also showed that he arranged payments to his daughter (D. Braxton) from Rogers and Glymph.

13. Braxton arranged with co-conspirators, including Glymph and Rogers, to import and obtain large wholesale quantities of illegal narcotics for redistribution purposes, including the following:

    a. A parcel containing 999 grams of fentanyl (with a purity of approximately 40%) seized by law enforcement on August 4, 2022, that was destined for a residence of Rogers;

    b. A parcel containing 982 grams of fentanyl (with a purity of approximately 65%) seized by law enforcement on October 26, 2022, which was destined for a residence utilized by Glymph and Rogers;

    c. A parcel containing 996 grams of fentanyl (with a purity of approximately 40%) seized by law enforcement on October 31, 2022, which was destined for a residence of Rogers;

    d. A parcel of approximately one kilogram of fentanyl that was delivered to a residence utilized by Glymph and Rogers on December 19, 2022;

    e. Approximately 300 grams of fentanyl (purity of approximately 68%) possessed by Rogers and seized by law enforcement in April 2023;

    f. A parcel containing 551.4 grams (5215 pills) of fentanyl/acetaminophen (with a purity of approximately 2.1%) seized by law enforcement on April 26, 2023, which was destined for a residence utilized by Glymph and Rogers;

    g. A parcel containing 236.2 grams of heroin seized by law enforcement on July 6, 2023, which was destined for a residence utilized by Glymph and Rogers;

    h. A parcel containing 97.4 grams of fentanyl (899 pills with a purity of approximately 4%) and 777 grams of fentanyl (powder with a purity of approximately 62%) seized by law enforcement on July 20, 2023, which was destined for a residence utilized by Glymph and Rogers;

    i. Approximately 2000 grams of fentanyl delivered to a residence of Rogers in approximately August 2023;

    j. A parcel containing approximately 300 grams of fentanyl delivered to a residence of Rogers on September 30, 2023;

    k. A parcel containing 1967.7 grams of p-Fluorofentanyl (fentanyl analogue, a Schedule I narcotic) delivered to a residence utilized by Glymph and Rogers on October 2, 2023;

    l. A parcel containing 1006.8 grams of carfentanil and fentanyl delivered to a residence of Rogers on October 17, 2023; and

    m. A parcel containing 1013 grams of fentanyl (purity of approximately 37%) delivered to and seized from the residence associated with Glymph and utilized by Glymph and Rogers.

14. During the conspiracy, Braxton coordinated the ordering, shipment, receipt, and payment for the drugs with members of the conspiracy, including the suppliers, Glymph and Rogers. This included coordinating where the drugs would be shipped to, the sharing of shipper tracking

information for the drugs, and the sharing of shipper tracking information for the shipment of drug payments.

15. The following illustrates how Braxton coordinated a shipment of fentanyl with Rogers and Glymph:

    a. On October 20, 2022, Braxton used his contraband phone to call Rogers to discuss the status of a drug shipment. In wiretap activation #348, Rogers asked Braxton, *"..You ever find out any of the situation about that.."* Braxton responded, *"... he said, he gave it to with the address, so he just waiting for him to ahh, get in to where they gotta go, cuz he got, they got to get across the way first and then ..but he said he gave them the address so everything in motion."* Later that day, in activation #423, Braxton called Rogers and advised Rogers that *"they ain't sent no conversations yet."* Rogers said, *"Yea, I mean if they ain't gonna do it, they ain't gonna do it, if they gonna do it, they gonna do it, fuck it."* Braxton then said, *"Yeah, I mean, but the beat goes on, but I wanted to have that, I wanted to have that."* Braxton continued, *"he said, that uh, wherever it's at, they gotta get it to the line…..And once it get there, then he can move around a little bit."* In these calls, when Braxton told Rogers that *"they got to get across the way first,"* that *"he gave them the address so everything in motion,"* and *"they gotta get it to the line,"* Braxton is advising Rogers that the drug shipment is on its way to Rogers' designated address, but the shipment needs to cross the border first.

    b. The following day, on October 21, 2022, Rogers called Braxton in activation #559 and asked, *"Uh, but you didn't hear no more bout that situation man?"* Braxton replied, *"…man what I, what I say to you yesterday?"* Braxton continued, *"You ain't gotta wait, when I find out, you gonna find out."* Later in the conversation, Braxton told

9

Rogers, "*Imma call him soon and make sure you got something in the air.*" In this conversation, Rogers attempts to get an update on the shipment. Braxton responded that Rogers would find out as soon as Braxton finds out. Braxton also advised Rogers that he would get in touch with the supplier to make sure the shipment is on its way.

c. The next day, October 22, 2022, Rogers received a call from Glymph. In activation #638, Glymph asked Rogers, "*You talk to Fatso* (Braxton's known nickname)?" Rogers replied, "*Uh, yesterday, last night.*" Rogers asked Glymph, "*Are you getting him all the information they need?* Glymph replied, "*Yeah.*" Rogers then asked, "*Well, they send you a tracking yet?*" After Glymph replied, "*Nope,*" Rogers stated, "*Ok, well then....when we get a tracking, I can know when to go round there and sit there, you know what I'm saying.*" Later that day, Rogers made a call to Glymph, in activation #677, and Glymph said, "*We going out uhh at the latest Tuesday, at the earliest Monday morning we be in the mail.*" Rogers replied, "*Oh, ok. As soon as you get it let me know something....*" In these calls, Rogers asked Glymph if he was getting Braxton what he needed for the drug shipment. After Glymph said he did, Rogers asked if he got the tracking information from Braxton for the drug shipment. Glymph said he had not yet received the shipping tracking information. In the subsequent call, Glymph advised Rogers that the drug shipment would be in the mail Monday or Tuesday.

d. On October 24, 2025, Braxton and Rogers had an intercepted telephone conversation in activation #892 discussing the current balance of $18,000 owed to the foreign drug suppliers. Braxton also advised Rogers that the awaited drug shipment was going out Tuesday or Wednesday.

e. On Tuesday, October 25, 2022, Glymph called Rogers in activation #1059 and stated,

> "*Aight, he said he'll send the receipt, it's, it's out.*" Glymph continued, "*He said, it's out, it's already gone.*" Later that day, in activation #1065, Glymph sent a picture message to Rogers of a picture of a shipping label that was addressed to a "Gregory Stephenson" at "6507 Foster, District Heights, MD 20747." The parcel was being shipped via UPS and was bearing the tracking number 1Z5XW8740153708431.
>
> f.  As a result of these intercepted communications between Braxton, Glymph and Rogers, law enforcement went to the UPS facility in Landover, Maryland, on October 26, 2022, and recovered the parcel addressed to a "Gregory Stephenson" at 6507 Foster, District Heights, Maryland 20747-2240, bearing the tracking number 1Z5XW8740153708431. After obtaining a search warrant for the package, law enforcement seized 982 grams of fentanyl with a purity of approximately 65 percent. The parcel was shipped from California.

16. As another example, Braxton arranged the shipment of another kilogram of fentanyl to Glymph and Rogers just days after the October 26, 2022 fentanyl seizure:

    a.  On October 28, 2022, Rogers received an incoming call from Glymph. In wiretap activation #1528, Glymph told Rgers, "*Yeah, I'm moving around, I'm posed to be uh, getting a new picture [picture with tracking information for another shipment] for us, so that's what I'm waiting on.*" Rogers replied, "*Yeah, I'm, I'm doing the same thing....Let me call you back.*" Later that same day, Rogers received two incoming text messages from Braxton. In activation #1595, Braxton texted Rogers, "*Yo the box be there tomorrow from the other people just got number yesterday there is no time come on ups [UPS] be on lookout.*" In activation #1597, Braxton then texted Rogers, "*no time of delivery just say tomorrow.*"

b. Approximately 25 minutes later, Rogers received an incoming call from Braxton. In activation #1603, Braxton told Rogers, *"The box supposed to be there tomorrow. They They don't have no time of delivery on it. I was tryin to send you the picture but my fuckin camera is fucked up so I just got the information. I'm lookin at it , I'm tryin to send it to you but I can't get it off of here."* As the conversation continued, Rogers told Braxton, *"The tracking number. Text Me the tracking number and I'll look at it on my, from my end."* Braxton then said, *"Ok, I'll text you the tracking number."* About an hour and half later, Rogers sent Braxton a text in activation #1626 in which he said, *"Send me the carrier and the tracking number let me know what carriers up on it and send me the tracking number."*

c. Minutes later, in activation #1638, Braxton texted Rogers a picture message with the shipping information for another package. The shipping label shown in the text message reflected that the parcel was being delivered to a "Juan Lopez" at 6508 Gateway Boulevard, District Heights, Maryland 20747, with a tracking number of 1Z78WB584423872048. 6508 Gateway Boulevard is located across the street and within eyesight of the home of Rogers' mother at 6501 Gateway Boulevard. In activations #1639 and $1641, Braxton followed up and texted Rogers *"Ups [UPS]"* and then *"The track number on right side."*

d. The following day, on the morning of October 29, 2022, law enforcement returned to the UPS Facility in Landover, Maryland, in response to intercepted communications between Rogers and Braxton indicating that a parcel containing suspected narcotics was scheduled to be delivered. According to intercepted text messages between Rogers and Braxton containing a shipping label, a parcel that originated from a UPS Store in

Miami, Florida was to be delivered to a "Juan Lopez" at 6508 Gateway Boulevard, District Heights, Maryland 20747, with a tracking number of 1Z78WB584423872048. Law enforcement located the parcel addressed to "Juan Lopez" at 6508 Gateway Boulevard, District Heights, Maryland 20747, and removed it from the sorting line. On October 31, 2022, pursuant to a search warrant, agents recovered a kilogram of fentanyl. A DEA Laboratory analysis confirmed a net weight of 996 grams of fentanyl with a purity of approximately 40 percent. Based upon the UPS information found on the package and from within the package, the fentanyl traveled from Fort Worth, Texas to Miami, Florida and then from Miami to the UPS facility in Landover, Maryland.

e. Not knowing that the package was seized by law enforcement, Braxton texted Rogers on October 29, 2022, at 11:37 a.m., in activation #1709, *"Supposed to be there by 12."* Later that day at 5:12 p.m., when the package had not been delivered as expected, Rogers texted Braxton in activation #1748, *"You check that thing man I do not like when sun supposed to come on day then it don't show up man I do not like that."* In activation #1750, Braxton replied, *"Look if it ain't there by 8 fuck it don't worry about."* In activation #1754, Rogers replied back, *"You ain't got to worry about me worrying about it cuz if it ain't there by I ain't touching it."*

f. Two days later, on October 31, 2022, Rogers received an incoming call from Braxton in activation #2009 in which they discussed the missing package. Rogers told Braxton, *"They talk about it supposed to be there next day at 12. That mother fucker was no where near. I'm sitting there all day cause I got a spot, right down the street from where...My mother fucking porch, and watch the whole movie."* Later in the conversation, having checked the tracking information for the package, Rogers stated,

*"mother fucker stayed in uh Landover the whole mother fucking time."* Braxton asked, *"It's still in Landover?"* Rogers replied, *"Yeah, that's where it will be at,"* to which Braxton responded, *"Yeah, he, he [the supplier] already knows. So we don't got to worry about that shit."* Rogers then commented, *"That's some dumb ass shit for him [the supplier] to do it that way. See, that red, that overnight shit is a red flag to any mother fucker on that. Especially coming out of those two spots. It came out of Miami, if it came out of Miami, or that Cali, or come out of them Texas, Miami, the real spots they red flags all the way."* Braxton stated, *"Yea, and then, when, when you specifically told them this is what (unitelligable), and he already knows like man, he from, he been doing that shit, you don't know what the ramification be where it's going at. I said, well I am telling you something for your own, your good and ours.*

17. On November 29, 2023, law enforcement officers executed search warrants on two residences of Rogers, and one residence utilized by Rogers and Glymph. The two Rogers residences are located at Massachusetts Avenue, N.W., Washington, D.C., and Gateway Boulevard, District Heights, Maryland. The residence utilized by Glymph and Rogers is located at Pineview Court, Waldorf, Charles County, Maryland, which is also the residence of Glymph's girlfriend.

18. As demonstrated by electronic communications and other evidence, these search warrants resulted in the seizures of kilograms of fentanyl and heroin attributable to shipments orchestrated by Braxton, shipped by his foreign suppliers, and received by Rogers and Glymph.

19. As a result of the search warrant executed on the Massachusetts Avenue residence, law enforcement recovered drug, drug trafficking paraphernalia, and other evidence, including the following:

a. A large red tote bag (Ex. 48)[1] with powdered residue found on the floor in Rogers' bedroom closet containing:

- A large Ziploc bag containing 494.8 grams of heroin (purity 16% ± 2%), fentanyl (purity 13% ± 1%), and carfentanil (Ex. 40).
- A large Ziploc bag with 704.8 grams of carfentanil (Ex. 41).
- A white envelope with 115.91 grams of fentanyl (Ex. 37).
- Ziplock bag containing 201.22 grams of fentanyl (3.8% pure) (Ex. 43).
- A laptop bag (Ex. 35a) containing fentanyl and heroin residue.
- Ziplock bags containing 1,785.30 grams of acetaminophen (Ex. 35.01) and 18.13 grams of fentanyl (Ex. 35.02).
- Scissors with fentanyl residue (Ex. 35b).
- A brown bag containing fentanyl, cocaine, and heroin residue (Ex. 36).
- Multiple cards with fentanyl and heroin residue (Ex. 36a).
- Razor blades with fentanyl and cocaine residue (Ex. 36b).
- Multiple empty Ziplock bags (Ex. N-77).
- 3 bottles of Manitol (a cutting agent) (Ex. N-78).
- Multiple containers of rubber bands (Ex. N-79).
- Fentanyl test strips (Ex. N-80).
- Multiple smaller Ziplock bags (Ex. N-81).
- 3 spoons with fentanyl and heroin residue (Ex. 38).
- 5 Scales with residue (Exs. 39, 44, 45, 47).
- Multiple Ziploc bags with Caffeine and Diphenhydramine (Ex. 42.01).
- Multiple strainers and spoons with residue (Ex. 46).
- A pink bag with fentanyl, cocaine, heroin residue (Ex. 49).

b. Approximately $23,000 in United States Currency recovered from the bedroom dresser and a shoebox in the bedroom closet (Ex. N-53).

c. One face mask with white powder residue that tested positive for fentanyl found on the high-top kitchen table (Ex. 50).

d. Two boxes of disposable masks found on kitchen table in living room (Ex. N-82).

e. One black FoodSaver Sealing Machine found in far-right kitchen cabinet (Ex. N-83).

f. One white camera with charging cable (Ex. N-84).

---

[1] Exhibit numbers refer to the DEA exhibit designations contained in the DEA reports.

    g. One notebook apparently with drug mixture instructions (N-85) found on kitchen table in living room.

    h. One container of rubber bands found on kitchen table in living room (Ex. N-86).

    i. One box of Ziploc baggies found on kitchen table in living room (Ex. N-87).

    j. One box of Nitrile Exam gloves found on kitchen table in living room (Ex. N-88).

20. As a result of the search warrant executed on Rogers' Gateway Boulevard residence, law enforcement recovered United States Currency, drugs, drug trafficking paraphernalia, and other evidence, including the following.

    a. Drug and drug trafficking paraphernalia included the following:

- 2 Ziploc bags containing 151.2 grams of fentanyl (purity 3.7% ± .5%), (Ex. 22).
- Several Ziploc bags containing .963 grams of fentanyl (8.4% pure) (Ex. 24).
- 2 plastic bags containing 2.451 grams of xylazine (Ex. 25.01) and 1.756 grams of heroin, fentanyl (Ex. 25.02).
- 2 plastic bags containing bundles of Ziplock bags containing 7.730 grams of fentanyl, heroin, xylazine (Ex. 26.01), 1.441 grams of carfentanil (Ex. 26.02), and 2.813 grams of acetaminophen (Ex. 26.03).
- 1 black bag containing residue and drug trafficking paraphernalia (Ex. 27), and 2 bundles of 20 Ziplock baggies containing 5.08 grams of fentanyl (purity 8.8%), heroin and xylazine (Ex. 52).
- Bags containing 97.35 grams of heroin and fentanyl (purity 15%) (Ex. 51.01), 5.442 grams of cocaine base (purity 85%) (Ex. 51.02), 14.23 grams of fentanyl and xylazine (purity 3.5%) (Ex. 51.03).

    b. Approximately $1,524.00 in United States Currency (Ex. N-52).

21. As a result of the search warrant executed on the Pineview Court residence, law enforcement recovered a FedEx parcel containing 1013.1 grams of fentanyl (purity 37% ± 3%) (Exs. 61 and 62).

22. The Defendant admits that the above-described drug evidence, drug trafficking paraphernalia, U.S. Currency, other evidence were part of and in furtherance of the conspiracy to distribute and possess with the intent to distribute illegal drugs.

23. The Defendant agrees that he personally has read, or had read to him, the Indictment and Superseding Information in Case No. 23-cr-394 (TNM), including the allegations and charges against the Defendant and his co-defendants in that Indictment. The Defendant agrees that he does not have information to dispute or disprove those allegations and charges against him, nor his co-defendants, set forth in the Indictment in any way. This Statement of the Offense fairly and accurately summarizes and describes some of the Defendant's actions and involvement in the offenses to which he is pleading guilty.

Sincerely,

Jeanine Ferris Pirro
United States Attorney

By:     */s/ George P. Eliopoulos*
       George P. Eliopoulos
       Matthew W. Kinskey
       Assistant United States Attorneys

### Defendant's Acceptance

I have read each of the pages that constitute the Government's proffer of evidence and have discussed it with my attorney, Brian McDaniel. I fully understand this proffer and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this agreement fully.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in my plea agreement.

I am satisfied with the legal services provided by my attorney in connection with this proffer and my plea agreement and matters related to it.

Date: 12/8/25

Samuel Braxton
Also Known as "Fats" and "Fatso"
Defendant

### Attorney's Acknowledgment

I have read each of the pages that constitute the Government's Proffer of Evidence, reviewed them with my client, Samuel Braxton, and discussed the provisions of the proffer with him fully. These pages accurately and completely set forth the Government's proof, as I understand it.

Date: 12/8/25

~~Brian McDaniel~~ Michael Lawler
Counsel for Defendant
Samuel Braxton

18