**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal No. 23-cr-00394-001 (TNM)** |
| | **:** | |
| **SAMUEL BRAXTON,** | **:** | |
| Also Known As | **:** | |
| "Fats" and "Fatso" | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENENCING

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing. As set forth below, the government respectfully requests that the Court sentence the Defendant, Wayne Glymph, to a sentence of 169 months of imprisonment, which is the mid-range of the applicable Sentencing Guidelines, at least 5 years of supervised release, and forfeiture. In support of this sentence, the government states the following.

### PROCEDURAL BACKGROUND

The Defendant has pled guilty to a Superseding Information charging him with Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of a Mixture or Substance Containing a Detectable Amount of Fentanyl, 100 Grams or More of a Mixture and Substance Containing a Detectable Amount of any Analogue of Fentanyl, and 100 Grams or More of a Mixture and Substance Containing a Detectable Amount of Heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), 841(b)(1)(B)(i) and 846. See Presentence Investigation Report ("PSR") dated March 16, 2026, at ¶¶ 4-7. This charge carries a mandatory minimum sentence of 10 years of imprisonment and a maximum sentence of life imprisonment; a fine not to exceed

1

$10,000,000; and a term of supervised release of not less than 5 years and up to life. The Defendant agrees to the forfeiture allegation in the Superseding Information. PSR at ¶ 10. The PSR and the plea documents reflect that Defendant's total offense level, after acceptance of responsibility, is 33 and his criminal history category is II, resulting in a Sentencing Guidelines imprisonment term of 151–188 months, with a statutory mandatory minimum of 10 years. PSR at ¶¶ 7-8, 142-43.

## FACTUAL BACKGROUND

The Drug Enforcement Administration commenced an investigation into a drug-trafficking organization that imports into, and redistributes within, the United States fentanyl, heroin, cocaine, cocaine base, and other controlled substances. Through the investigation, including recoveries of many kilograms of fentanyl, fentanyl analog, heroin, and other illegal drugs, and wiretap interceptions over the course of the investigation, law enforcement was able to identify defendants Samuel Braxton, Wayne Glymph, Ronnie Rogers, and others as being the key and upper echelon players in this drug trafficking operation. Specifically, Braxton conspired to import and did orchestrate the importation, shipment and redistribution of fentanyl, fentanyl analogue, and heroin. Through foreign nationals, Braxton was brokering shipments of these drugs into the DC area on behalf of Rogers and Glymph. Rogers and Glymph would then cut and repackage these large shipments, and supply redistributors in the DC area. Co-defendants Michael Stewart, Ricky Jackson, Michael Owens, and OJ Brown were supplied by Rogers, and they then redistributed the shipments to other redistributors and to end users. Glymph also had his redistribution network in and around the DC area for redistributing the shipments brokered by Braxton. Defendant's participation in the operation included over 12 kilograms of fentanyl (including carfentanil), almost 2 kilograms of fentanyl analog (p-Fluorofentanyl), over 236 grams of heroin, and other

illegal drugs. From no later than July 2021 and continuing until about November 2023, when the defendants were arrested, the Defendant conspired to, and did in fact, distribute and possess with intent to distribute fentanyl, fentanyl analogue, and heroin. In aggregate, the converted drug weight, including from the reasonably foreseeable conduct of all the members of the conspiracy known to the Defendant, was no less than 30,000 kilograms but no greater than 90,000 kilograms.

As the Court knows from Defendant Braxton's plea hearing, Braxton's criminal involvement with Glymph was not a recent manifestation. See also PSR at ¶ 19. Braxton and Glymph have known each other and have been partners in crime for many years. On or about February 22, 2012, Braxton and Glymph were indicted together in District of Maryland Criminal Case No. 8:12-cr-86 for conspiring to distribute and possess with the intent to distribute heroin, cocaine base, and PCP. Both were convicted of the conspiracy and incarcerated. Braxton was eventually incarcerated at FCI Butner in North Carolina and later at FCI Fort Dix in New Jersey. Braxton was housed at FCI Fort Dix during the entirety of this investigation when he was orchestrating the importation and shipment of the fentanyl, fentanyl analogue, and heroin. He continues to serve the District of Maryland sentence.

Glymph completed his District of Maryland sentence in December 2020 and then returned to the DC area. He was on supervised release in that case while involved as a key member of the conspiracy at issue in the instant case.

Braxton introduced Glymph to Ronnie Rogers after Glymph was released from prison. Braxton and Rogers have also known each other for many years. They were incarcerated together at FCI Butner in North Carolina for approximately four years between 2015 to 2019. Braxton served part of the sentence imposed in the District of Maryland case described above at FCI Butner,

and Rogers was serving a sentence of over 10 years for a separate federal heroin trafficking conviction from the District of Maryland. Rogers was released from prison in July 2019 and returned to the DC area.

While incarcerated at Fort Dix, Braxton had access to a contraband cell phone. Court authorized wiretaps were placed on Braxton's phone and GPS evidence placed Braxton's cell phone at Fort Dix. Evidence, including wiretap interceptions, confirmed that Braxton was the user of the phone in the conspiracy. As an example, in wiretap activation #6563, Braxton called the District of Maryland about a motion he filed in his District of Maryland case. He identified his case by its case number and provided his name as "Samuel Braxton." Braxton's cell phone was eventually seized from his housing unit at Fort Dix by law enforcement during this investigation.

In 2021, while Braxton was incarcerated at Fort Dix, he introduced Glymph to foreign nationals who were sources of supply of fentanyl, fentanyl analogue, heroin, and other drugs. Braxton also introduced Glymph to his former jail mate, Ronnie Rogers, for the purpose of Glymph and Rogers acquiring shipments of drugs from the foreign nationals and then cutting, repackaging and redistributing the drugs in and around the District of Columbia. Glymph and Rogers were responsible for paying for the shipments.

As evidenced by wiretap calls of Braxton, Glymph, and Rogers, and seizures of drugs, drug proceeds, and drug payments, Braxton, Glymph and Rogers began to coordinate the importation and redistribution of large shipments of fentanyl (including counterfeit pills made of fentanyl), fentanyl analogue, heroin, and other drugs. As evidenced by the wiretaps, Braxton expected a cut of the drug proceeds. In activation #214, on December 7, 2022, Braxton (who was referred to as "Sam") complained to Rogers that Glymph was "fucking up my allowance … my money." In

4

activation #347 on December 8, 2022, Braxton again complained to Rogers about his share and asked, "when's my allowance going to get like it's supposed to be?"  Intercepted calls with Braxton on his contraband phone also showed that he arranged payments to his daughter from Rogers and Glymph.

In 2021, 2022, and 2023, Braxton, Glymph, and Rogers communicated with foreign nationals and coordinated the shipments of kilogram quantities of fentanyl, fentanyl analogue, heroin, and other drugs to the DC area for redistribution purposes, including the following:

a. A parcel containing 999 grams of fentanyl (with a purity of approximately 40%) seized by law enforcement on August 4, 2022, that was destined for a residence of Ronnie Rogers;

b. A parcel containing 982 grams of fentanyl (with a purity of approximately 65%) seized by law enforcement on October 26, 2022, which was destined for a residence utilized by Glymph and Rogers;

c. A parcel containing 996 grams of fentanyl (with a purity of approximately 40%) seized by law enforcement on October 31, 2022, which was destined for a residence of Rogers;

d. A parcel of approximately one kilogram of fentanyl that was delivered to a residence utilized by the Glymph and Rogers on December 19, 2022;

e. Approximately 300 grams of fentanyl (purity of approximately 68%) seized by law enforcement in April 2023;

f. A parcel containing 551.4 grams (5215 counterfeit pills) of fentanyl/acetaminophen (with a purity of approximately 2.1%) seized by law enforcement on April 26, 2023, which was destined for a residence utilized by the Glymph and Rogers;

g.  A parcel containing 236.2 grams of heroin seized by law enforcement on July 6, 2023, which was destined for a residence utilized by Glymph and Rogers;

h.  A parcel containing 97.4 grams of fentanyl (899 counterfeit pills with a purity of approximately 4%) and 777 grams of fentanyl (powder with a purity of approximately 62%) seized by law enforcement on July 20, 2023, which was destined for a residence utilized by the Glymph and Rogers;

i.  Approximately 2000 grams of fentanyl delivered to Rogers at his residence in approximately August 2023;

j.  A parcel containing approximately 300 grams of fentanyl delivered to a residence of Rogers on September 30, 2023;

k.  A parcel containing 1967.7 grams of p-Fluorofentanyl (fentanyl analogue, a Schedule I narcotic) delivered to a residence utilized by Glymph and Rogers on October 2, 2023;

l.  A parcel containing 1006.8 grams of carfentanil and fentanyl delivered to a residence of Rogers on October 17, 2023; and

m.  A parcel containing 1013 grams of fentanyl (purity of approximately 37%) delivered to and seized in November 2023 from the residence of Glymph's girlfriend that was a residence utilized by Glymph and Rogers.

Braxton, Glymph and Rogers coordinated the ordering, shipment, and receipt of, and payment for, the drugs with other members of the conspiracy, including their suppliers. This included coordinating where the drugs would be shipped to, the sharing of shipper tracking information for the drugs, and the sharing of shipper tracking information for the shipment of drug payments.

The following illustrates how Braxton, notwithstanding his incarceration, coordinated the shipment of fentanyl with Glymph and Rogers.  On October 20, 2022, Braxton used his contraband phone to call Rogers to discuss the status of a drug shipment.  In wiretap activation #348, Rogers asked Braxton, *"..You ever find out any of the situation about that.."*  Braxton responded, *"... he said, he gave it to with the address, so he just waiting for him to ahh, get in to where they gotta go, cuz he got, they got to get across the way first and then ..but he said he gave them the address so everything in motion."* Later that day, in activation #423, Braxton called Rogers and advised Rogers that "*they ain't sent no conversations yet."*  Rogers said, *"Yea, I mean if they ain't gonna do it, they ain't gonna do it, if they gonna do it, they gonna do it, fuck it."*  Braxton then said, *"Yeah, I mean, but the beat goes on, but I wanted to have that, I wanted to have that."*  Braxton continued, "*he said, that uh, wherever it's at, they gotta get it to the line.....And once it get there, then he can move around a little bit."*  In these calls, when Braxton told Rogers that "*they got to get across the way first,*" that "*he gave them the address so everything in motion,*" and "*they gotta get it to the line,*" Braxton is advising Rogers that the drug shipment is on its way to Rogers' designated address, but the shipment needs to cross the border first.

The following day, on October 21, 2022, Rogers called Braxton in activation #559 and asked, "*Uh, but you didn't hear no more bout that situation man?*"  Braxton replied, *"...man what I, what I say to you yesterday?*"  Braxton continued, "*You ain't gotta wait, when I find out, you gonna find out.*"  Later in the conversation, Braxton told Rogers, "*Imma call him soon and make sure you got something in the air.*"  In this conversation, Rogers attempts to get an update on the shipment.  Braxton responded that Rogers would find out as soon as Braxton finds out.  Braxton also advised Rogers that he would get in touch with the supplier to make sure the shipment is on

its way.

The next day, on October 22, 2022, Rogers received a call from Glymph.  In activation #638, Glymph asked Rogers, "*You talk to Fatso* (Braxton's known nickname)?"  Rogers replied, "*Uh, yesterday, last night.*"  Rogers asked Glymph, "*Are you getting him all the information they need*?  Glymph replied, "*Yeah.*"  Rogers then asked, "*Well, they send you a tracking yet?*"  After Glymph replied, "*Nope,*" Rogers stated, "*Ok, well then….when we get a tracking, I can know when to go round there and sit there, you know what I'm saying.*"  Later that day, Rogers made a call to Glymph, in activation #677, and Glymph said, "*We going out uhh at the latest Tuesday, at the earliest Monday morning we be in the mail.*"  Rogers replied, "*Oh, ok.  As soon as you get it let me know something….*"  In these calls, Rogers asked Glymph if he was getting Braxton what he needed for the drug shipment.  After Glymph said he did, Rogers asked if he got the tracking information from Braxton for the drug shipment.  Glymph said he had not yet received the shipping tracking information.  In the subsequent call, Glymph advised Rogers that the drug shipment would be in the mail Monday or Tuesday.

On October 24, 2025, Braxton and Rogers had an intercepted telephone conversation in activation #892 discussing the current balance of $18,000 owed to the foreign drug suppliers.  Braxton also advised Rogers that the awaited drug shipment was going out Tuesday or Wednesday.

On Tuesday, October 25, 2022, Glymph called Rogers in activation #1059 and stated, "*Aight, he said he'll send the receipt, it's, it's out.*"  Glymph continued, "*He said, it's out, it's already gone.*"  Later that day, in activation #1065, Glymph sent a picture message to Rogers of a picture of a shipping label that was addressed to a "Gregory Stephenson" at "**** [the number is being intentionally omitted by the undersigned] Foster, District Heights, MD 20747." The parcel

was being shipped via UPS and was bearing the tracking number 1Z5XW8740153708431.

As a result of these intercepted communications between Braxton, Glymph and Rogers, law enforcement went to the UPS facility in Landover, Maryland, on October 26, 2022, and recovered the parcel addressed to a "Gregory Stephenson" at **** Foster, District Heights, Maryland 20747-2240, bearing the tracking number 1Z5XW8740153708431. After obtaining a search warrant for the package, law enforcement seized 982 grams of fentanyl with a purity of approximately 65 percent. The parcel was shipped from California.

As another example, Braxton arranged the shipment of another kilogram of fentanyl to Glymph and Rogers just days after the October 26, 2022 fentanyl seizure. On October 28, 2022, Rogers received an incoming call from Glymph. In wiretap activation #1528, Glymph told Rogers, "*Yeah, I'm moving around, I'm posed to be uh, getting a new picture [picture with tracking information for another shipment] for us, so that's what I'm waiting on.*" Rogers replied, "*Yeah, I'm, I'm doing the same thing….Let me call you back.*" Later that same day, Rogers received two incoming text messages from Braxton. In activation #1595, Braxton texted Rogers, "*Yo the box be there tomorrow from the other people just got number yesterday there is no time come on ups [UPS] be on lookout.*" In activation #1597, Braxton then texted Rogers, "*no time of delivery just say tomorrow.*"

Approximately 25 minutes later, Rogers received an incoming call from Braxton. In activation #1603, Braxton told Rogers, "*The box supposed to be there tomorrow. They They don't have no time of delivery on it. I was tryin to send you the picture but my fuckin camera is fucked up so I just got the information. I'm lookin at it , I'm tryin to send it to you but I can't get it off of here.*" As the conversation continued, Rogers told Braxton, "*The tracking number. Text Me the*

*tracking number and I'll look at it on my, from my end.*" Braxton then said, "*Ok, I'll text you the tracking number.*"  About an hour and half later, Rogers sent Braxton a text in activation #1626 in which he said, "*Send me the carrier and the tracking number let me know what carriers up on it and send me the tracking number.*"

Minutes later, in activation #1638, Braxton texted Rogers a picture message with the shipping information for another package.  The shipping label shown in the text message reflected that the parcel was being delivered to a "Juan Lopez" at 6508 Gateway Boulevard, District Heights, Maryland 20747, with a tracking number of 1Z78WB584423872048.  6508 Gateway Boulevard is located across the street and within eyesight of the home of Rogers' mother at 6501 Gateway Boulevard.  In activations #1639 and $1641, Braxton followed up and texted Rogers "*Ups [UPS]*" and then "*The track number on right side.*"

The following day, on the morning of October 29, 2022, law enforcement returned to the UPS Facility in Landover, Maryland, in response to intercepted communications between Rogers and Braxton indicating that a parcel containing suspected narcotics was scheduled to be delivered. According to intercepted text messages between Rogers and Braxton containing a shipping label, a parcel that originated from a UPS Store in Miami, Florida was to be delivered to a "Juan Lopez" at 6508 Gateway Boulevard, District Heights, Maryland 20747, with a tracking number of 1Z78WB584423872048.  Law enforcement located the parcel addressed to "Juan Lopez" at 6508 Gateway Boulevard, District Heights, Maryland 20747, and removed it from the sorting line.  On October 31, 2022, pursuant to a search warrant, agents recovered a kilogram of fentanyl. A DEA Laboratory analysis confirmed a net weight of 996 grams of fentanyl with a purity of approximately 40 percent.  Based upon the UPS information found on the package and from within

the package, the fentanyl traveled from Fort Worth, Texas to Miami, Florida and then from Miami to the UPS facility in Landover, Maryland.

Not knowing that the package was seized by law enforcement, Braxton texted Rogers on October 29, 2022, at 11:37 a.m., in activation #1709, *"Supposed to be there by 12."* Later that day at 5:12 p.m., when the package had not been delivered as expected, Rogers texted Braxton in activation #1748, *"You check that thing man I do not like when sun supposed to come on day then it don't show up man I do not like that."* In activation #1750, Braxton replied, *"Look if it ain't there by 8 fuck it don't worry about."* In activation #1754, Rogers replied back, *"You ain't got to worry about me worrying about it cuz if it ain't there by I ain't touching it."*

Two days later, on October 31, 2022, Rogers received an incoming call from Braxton in activation #2009 in which they discussed the missing package. Rogers told Braxton, *"They talk about it supposed to be there next day at 12. That mother fucker was no where near. I'm sitting there all day cause I got a spot, right down the street from where…My mother fucking porch, and watch the whole movie."* Later in the conversation, having checked the tracking information for the package, Rogers stated, *"mother fucker stayed in uh Landover the whole mother fucking time."* Braxton asked, *"It's still in Landover?"* Rogers replied, *"Yeah, that's where it will be at,"* to which Braxton responded, *"Yeah, he, he [the supplier] already knows. So we don't got to worry about that shit."* Rogers then commented, *"That's some dumb ass shit for him [the supplier] to do it that way. See, that red, that overnight shit is a red flag to any mother fucker on that. Especially coming out of those two spots. It came out of Miami, if it came out of Miami, or that Cali, or come out of them Texas, Miami, the real spots they red flags all the way."* Braxton stated, *"Yea, and then, when, when you specifically told them this is what (unitelligable), and he already knows like*

11

*man, he from, he been doing that shit, you don't know what the ramification be where it's going*

*at. I said, well I am telling you something for your own, your good and ours.*

On November 29, 2023, law enforcement officers executed search warrants on two residences of Rogers, and one residence utilized by Rogers and Glymph. The two Rogers residences are located at Massachusetts Avenue, N.W., Washington, D.C., and Gateway Boulevard, District Heights, Maryland. The residence utilized by Glymph and Rogers is located at Pineview Court, Waldorf, Charles County, Maryland, which is also the residence of Glymph's girlfriend.

As demonstrated by electronic communications and other evidence, these search warrants resulted in the seizures of kilograms of fentanyl and heroin attributable to shipments orchestrated by Braxton, shipped by his foreign suppliers, and received by Rogers and Glymph.

The Defendant has admitted that the above-described drug evidence, along with drug trafficking paraphernalia, U.S. Currency, and other evidence were part of and in furtherance of the conspiracy to distribute and possess with the intent to distribute illegal drugs.

### SENTENCING FACTORS

In sentencing a defendant, after calculating the appropriate guideline range, the Court must consider the factors set forth in 18 U.S.C. Section 3553. See Gall v. United States, 552 U.S. 38 (2007). These factors are in keeping with the traditional factors used by courts when imposing a sentence: (1) the protection of society against wrongdoers; (2) the punishment or discipline of the wrongdoer; (3) deterrence from the commission of like offenses; and (4) the reformation of the wrongdoer. See Spanziano v. Florida, 468 U.S. 447, 477-78 (1984) (Stevens, J., concurring); see also Williams v. New York, 337 U.S. 241, 251 (1949). Finally, under the guidelines and Section

3553, similarly situated defendants should receive like punishments. See 18 U.S.C. Section 3553(a)(6).

First, this is a very serious offense. The Defendant was the top and unifying member of a large drug trafficking conspiracy involving at least eight individuals, as reflected in the indictment in this case. The Defendant has agreed that he is accountable for orchestrating, acquiring, possessing with the intent to distribute, and redistributing massive quantities of extremely potent fentanyl, fentanyl analogue, and heroin. His importation, and redistribution of fentanyl, fentanyl analogue, and heroin, the most dangerous and addictive drugs in our community and nation, establishes that the Defendant was indifferent to the destruction he and his co-conspirators were causing to the users of their illegal narcotics and to the community at large. These drugs are significant barriers to individual and communal prosperity, public health, and community safety. They contribute to the decay of our society and community and account for tens of thousands of overdose deaths in this country each year.

The will of the Defendant to continually make himself an available gateway for these drugs on behalf of international traffickers shows his clear disregard for our community and his paramount desire to make personal profit and maintain his drug pipeline. It was the Defendant's role in the conspiracy to arrange for bringing these dangerous drugs to the United States market for redistribution, all for a profit. The detrimental effect of all these drugs is further compounded by their high purity, which would allow for the cutting and redistribution of far larger quantities of narcotics.

Second, Defendant Braxton's criminal behavior in this case is amplified by an abysmal criminal history, stretching over 36 years. It includes convictions in four drug trafficking cases,

13

two of which were federal convictions.  He had several probation violations and, as we know, he spearheaded the instant conspiracy from prison while serving his sentence for another federal drug conspiracy conviction.  PSR at 66-70.  Although Braxton has five serious convictions, he is fortunate that he did not receive any criminal history points except for his District of Maryland conviction. Otherwise, his guidelines range would have been far higher.  Id.  Accordingly, his criminal history score does not accurately represent his criminal history.

Moreover, four prior lengthy terms of imprisonment for drug trafficking, including the 24-year term imposed in the District of Maryland case, also proved insufficient to deter Braxton from importing and redistributing controlled substances in this case.  Despite his present incarceration, Braxton not only maintained but increased his criminal network.  As discussed above, in the District of Maryland Criminal Case No. 8:12-cr-86, Braxton and Glymph were convicted of conspiring to distribute and possess with the intent to distribute heroin, cocaine base, and PCP. While serving his sentence, Braxton introduced Glymph to foreign suppliers and to Ronnie Rogers for the purpose of importing into this country and trafficking the deadliest of drugs.  Braxton turned those introductions into a large-scale drug trafficking enterprise.

Third, Defendant's long criminal history, along with his involvement in an extensive drug trafficking conspiracy, evidence his unwavering desire to pursue a life of crime and profit at the expense of his community.  The law makes clear that his crimes in the instant case are of a kind that require serious consequences to deter the recurrence of such conduct by him and others.  A strong, though appropriate, sentence is necessary to ensure the safety of the community and, hopefully, to deter Defendant Braxton from engaging in similar criminal conduct in the future.  It is now time to protect our community, and a stiff penalty would be appropriate.  Accordingly, the

14

recommended sentence of 169 months of incarceration will provide needed deterrence in order to protect the community from Defendant's criminal behavior.

Fourth, a sentence of 169 months of incarceration followed by at least five years of supervised release will also provide the Defendant with an adequate amount of time to take advantage of many of the programs offered by the Bureau of Prisons (BOP), if he so chooses. These programs are intended to provide the Defendant with the tools he needs to re-enter society as a contributing member and to fulfill his societal responsibilities.

WHEREFORE, for the foregoing reasons and for any other reasons that may be raised at the hearing on this matter, the government asks that the Court sentence the Defendant to the term of incarceration of 169 months, to be followed by at least 5 years of supervised release, and forfeiture.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: _/s/_ George Eliopoulos_____
GEORGE ELIOPOULOS
Assistant United States Attorney
D.C. Bar No. 390-601
MATTHEW KINSKEY
Assistant United States Attorney
601 D Street, N.W.,
5th Floor
Washington, D.C. 20530
202-252-6957